# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re,<br><br>Stephen Andrew Brush,<br><br>                         Debtor.<br><br>Connie Godowns,<br><br>                         Plaintiff,<br><br>v.<br><br>Stephen Andrew Brush,<br><br>                         Defendant. | C/A No. 10-07692-DD<br><br>Adv. Pro. No. 11-80009-DD<br><br>Chapter 7<br><br>**ORDER** |

This matter is before the Court on a Complaint filed by Connie Godowns ("Plaintiff") against Stephen Andrew Brush ("Defendant") on February 2, 2011. Defendant filed an Answer to Plaintiff's Complaint on March 4, 2011. A trial was held October 26, 2011 through October 28, 2011. These are the Court's Findings of Fact and Conclusions of Law.

## **FINDINGS OF FACT**

1. Defendant is the sole shareholder of Brush Construction, Inc. At all times relevant, Defendant and his business engaged in residential and commercial construction. Brush Construction, Inc.'s work was conducted under Defendant's contractor license. Defendant's bankruptcy schedules indicate that Brush Construction, Inc. is no longer in business.

2. In late 2004, Plaintiff and Defendant entered into an oral agreement for Defendant to build Plaintiff a home on a lot Plaintiff had previously purchased. The lot is located near the Atlantic Ocean in Edisto Beach, South Carolina.

3. Prior to entering into the agreement, Plaintiff and Defendant were friends. Plaintiff chose Defendant to build her home based on her and her family's personal relationship with Defendant. Plaintiff testified that her relationship with Defendant caused her to place great trust and confidence in Defendant and his home-building abilities. Plaintiff testified that she did not consider any other builders and did not consider requesting a written contract.

4. The parties agreed that the home would be built on a "cost plus" basis, meaning that Plaintiff would pay for all costs relating to the construction of the home, plus a certain percent above costs for project management. The parties agreed that Plaintiff would pay costs plus twenty percent.

5. Plaintiff planned to spend approximately $750,000 on the home. On May 31, 2005, an application for a building permit for the construction of the home was submitted and listed the cost of construction as $750,000. Defendant signed the permit.

6. When Plaintiff's home was substantially completed in late 2006, the total amount Plaintiff had paid to Defendant was $2,681,234.10. The substantially completed home is slightly over 2,500 heated square feet. The total square footage of the home, including decks, porches, and the garage is 4,350 square feet. The cost per square foot of the home is $1,033.00. There was testimony that several elements of the home remain uncompleted or defective, such that repairs are needed.

7. Three appraisals were obtained for the property between August and November 2006. These appraisals found the value of the property to be between $1,063,000 and $1,609,259.

8. Records of Brush Construction, Inc. reflect total expenses relating to the construction of Plaintiff's home of approximately $1,800,000. After adding an additional twenty percent in accordance with the parties' agreement, the total price of the home as reflected in Brush Construction, Inc.'s records is approximately $2,200,000. Defendant concedes that there is no documentation for the additional almost $500,000 Plaintiff also paid to him. Defendant claims that invoices, emails, and written memoranda that would support these additional costs were lost when a laptop computer he used became inoperable.

9. Plaintiff's expert Christopher Epps, a construction consultant employed by Resolution Management Consultants, Inc., testified that after examination of all the relevant records, he believed a reasonable cost of construction for Plaintiff's house was approximately $1,400,000.

10. Records from Brush Construction, Inc. show that on many occasions Plaintiff was billed more than Defendant paid both suppliers and subcontractors. In many cases, Defendant added even sums to the amount of the bill before invoicing Plaintiff; commonly the amount of the markup was $1,000. Defendant testified that he often added field labor costs to supply bills before invoicing Plaintiff and that the extra amounts were due to this addition. However, this explanation was not credible, as the amounts added in the majority of cases were even amounts, and, as discussed below, field labor was charged to Plaintiff separately, at an hourly rate. Additionally, in at least one instance, Defendant testified that he paid an employee $1,000 to finish the interior of the elevator. However, testimony established that Plaintiff was also charged additional labor for the same employee; she was charged for his time both as a supervisor and as a laborer. Adding

costs for additional labor to bills from suppliers when Plaintiff was separately charged for the labor performed by the same employees undermines Defendant's credibility.

11. In at least two instances, Defendant admitted that Plaintiff was overbilled. For example, Defendant stated on the third day of trial that he had invoiced Plaintiff $1,000 for a particular bill because he couldn't remember the exact amount of the subcontractor's bill; however, Defendant testified that he found a copy of the check paid to the subcontractor the night before he testified and that it was actually $950. Defendant therefore conceded that he had overbilled Plaintiff by $50.

12. One component of the costs Defendant passed along to Plaintiff was for "field labor," which was charged for Brush Construction, Inc. employees who worked at the job site in lieu of subcontractors. Defendant's records show that he used a formula to calculate the amount he charged Plaintiff for "field labor" used to build Plaintiff's home. This formula adds a base hourly rate for each employee, approximately 20 percent for equipment overhead, between 36 and 49 percent for labor overhead, and 15 percent for general overhead. Ten percent was then added to the total amount for "profit" in order to arrive at the final hourly rate at which Plaintiff was billed. 20 percent was also added to these amounts based on the parties' cost plus agreement.

13. It was not entirely clear how the percentages applied for various categories of overhead were determined. Records from Brush Construction, Inc. indicate that equipment overhead includes fuel for employees' vehicles, auto repair and maintenance, equipment rental, fleet, "automobile expense", parking fees and fines, and equipment repairs. The records indicate that labor overhead includes construction salaries, payroll expenses such as Medicare and Social Security, and 90 percent of office and officer salaries. No records

with a breakdown of general overhead were provided; therefore, what expenses were included in "general overhead" was not clear, but some testimony suggested that this included general overhead costs for the operation of Defendant's construction business, many of which were not specifically related to Plaintiff's home. Regardless of the standard employed, the addition of a profit component to the labor bill is clear evidence of fraud in the marking up of the bills passed on to Plaintiff.

14. Plaintiff's expert Richard Livingston, a forensic accountant familiar with cost plus contracts, testified that Defendant's field labor charges were unreasonable. He stated that the industry standard for labor is a markup of up to 30 percent above the employee's hourly rate. He stated that this is typically to account for the cost of benefits provided to the employee, such as health insurance, workers' compensation, and other benefits commonly provided by the employer. Mr. Livingston stated that he had never seen general overhead and profit added to an employee's hourly rate; instead, he testified that such amounts would generally be absorbed in the 20 percent management fee. Mr. Epps also testified that a typical markup is 30 percent or less and stated he had never seen a markup of over 100 percent, like in the present case.

15. Defendant's method of billing for field labor resulted in a markup of well over 100 percent above the employees' hourly rates. Defendant did not provide these employees with health insurance or any other benefits except reimbursement for gas and the employer's share of certain taxes, although there was some testimony that the field employees used company vehicles and tools in the course of their work.

16. Plaintiff was also charged for administrative labor. Defendant's records show that Plaintiff was charged a total of $139,272.94 for administrative labor between May 31,

2005 and August 25, 2006. This amount represented 75 percent of one administrative employee's salary, 100 percent of another's salary, 50 percent of two employees' salaries, and 75 percent of Defendant's own salary for that time period. Plaintiff's home constituted 44 percent of Brush Construction's projects in 2005 and 45 percent in 2006. Defendant's attempt to pass on his own salary as a cost to Plaintiff when he was also compensated for the job by a 20 percent management fee is further clear evidence of fraud in the marking up of the bills passed on to Plaintiff.

17. Mr. Livingston testified that administrative labor would generally not be charged to a client in a cost plus system, unless the administrative employees were located at the job site and were performing very specific duties solely for the particular job. Evidence presented at the trial did not establish either of these circumstances was present in Plaintiff's case. Other than Defendant, none of the administrative employees went to the site of Plaintiff's home at any time; instead, they worked from Defendant's office. Conflicting testimony was presented regarding the amount of time Defendant himself spent at the job site.

18. Several portions of Plaintiff's home were torn out and rebuilt at least once, including a downstairs bathroom, the master bedroom, and a portion of the roof on the home. It is unclear whether this work was initiated by Plaintiff or was a result of defects in the original work. With the exception of kitchen cabinetry which was torn out and reinstalled at no cost to Plaintiff, Plaintiff was billed for all rework and repairs. Mr. Epps testified that in a cost plus contract a homeowner should not be billed for repair of defective construction.

19. Several changes were made to the original plans for the home, including expanding and waterproofing a deck and screening in a porch.  Many upgrades to the home were also made; for example, a custom audio system and automatic hurricane shutters were added to the home during the construction process.  Plaintiff testified that she approved many of these changes at the urging of Defendant.  Plaintiff also conceded that she made several changes to the original plans for the home on her own.

20. Plaintiff testified that she planned to pay for the work as the project progressed.  Each time Defendant sent her an invoice, she wrote him a check for the amount of the invoice.  Defendant used a variety of invoice formats, including American Institute of Architects ("AIA") and Quickbook forms.  Expert testimony established that AIA standards are one commonly used set of standards for tracking costs in a cost plus contract but are not the only standards reasonably employed in the construction industry.  When Defendant used AIA forms, the forms were not completed in accordance with the accompanying instructions and general AIA standards.  Many, if not all, of the invoices did not contain a detailed breakdown of what Plaintiff was being billed for.  At one point during his testimony Defendant testified that Plaintiff received detailed invoices as the project progressed.  However, an email he sent to Plaintiff undermined this testimony, as it indicated a begrudging willingness in October 2006, late in the construction process, to finally supply Plaintiff with documents detailing the construction costs.  Defendant claimed in the email he had never previously provided such documents for any other client.

21. In addition to writing multiple checks to Brush Construction, on several occasions Plaintiff gave blank checks to Defendant or his employees with instructions to fill out the

check for whatever amount Plaintiff owed. The total amount paid by checks not completed by Plaintiff, but by someone else for Defendant's benefit, was $662,567.99.

22. Defendant often billed Plaintiff prior to paying a subcontractor's bill. On at least one occasion, Defendant billed Plaintiff for materials prior to ordering them.

23. Plaintiff testified that she began to worry about the amount of money she was spending on the home in early 2006. In early 2007, Plaintiff obtained counsel to assist her with her dispute with Defendant relating to the cost of construction. Plaintiff's counsel wrote to Defendant requesting certain documents related to the construction in January 2007.

24. In March 2007, after Defendant failed to provide Plaintiff's counsel with the requested documents, Plaintiff filed suit against Defendant in state court solely for the purpose of obtaining the requested documentation and for an accounting. The documents were still not produced, and in December 2007, the Court of Common Pleas entered an order requiring Defendant to respond to Plaintiff's request. He never fully responded.

25. Defendant testified, as noted earlier, that he kept numerous records relating to the construction of Plaintiff's home on his laptop, including all records which explained excess amounts charged to Plaintiff. However, the laptop became inoperative in 2008, after the order was entered by the Court of Common Pleas. Defendant testified that he sent the laptop to several computer specialists in an attempt to retrieve the information stored on it, but no one was able to do so. Defendant testified that he also had another laptop fail in 2010.

26. Defendant initially seemed confused about the date that his laptop became inoperative, suggesting that the loss of the computer kept him from supplying Plaintiff with the requested records, especially those supporting the nearly $500,000 that has never been

accounted for. The date of the court order to produce documents and the subsequent date that the computer became inoperable undermine the credibility of Defendant's contention that the data loss was related to his failure to supply records, as they were initially requested almost a year prior to the laptop failure. Despite the testimony of Defendant that documents supporting the additional $500,000 in costs, now undocumented, were on his laptop, the Court infers from Defendant's failure to comply with the court order to turn the records over to Plaintiff at the time the laptop was operable that the documents do not and did not exist.

27. In 2008, Plaintiff filed a state court action against Defendant and Brush Construction, Inc. and a trial date of November 1, 2010 was set. Defendant's chapter 7 bankruptcy case was filed October 28, 2010. Plaintiff's action against Defendant was listed on his Statement of Financial Affairs, but was not otherwise disclosed on Defendant's Schedules.

## **CONCLUSIONS OF LAW**

Plaintiff seeks a determination that her damages claim against Defendant is nondischargeable under 11 U.S.C. § 523(a)(2)(A), (a)(4), and (a)(6). The parties agree that this Court will not make a determination regarding the amount of damages but rather will simply determine whether the debt, whatever it is, is nondischargeable. At the conclusion of Plaintiff's case, Defendant made a motion for directed verdict on all causes of action. The Court granted Defendant's motion on Plaintiff's section 523(a)(6) cause of action but denied the motion with respect to all other causes of action.

**I. 11 U.S.C. § 523(a)(6)**

Section 523(a)(6) states, in relevant part, "A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt – (6) for

willful and malicious injury by the debtor to another entity or to the property of another entity." Section 523(a)(6) requires an actual intent to cause injury, and is not satisfied merely by recklessness or gross negligence. *Duncan v. Duncan (In re Duncan)*, 448 F.3d 725, 729 (4th Cir. 2006) (citations omitted). It is not enough that the debtor engages in a deliberate or intentional act which leads to injury; instead, a deliberate or intentional injury is required. *Id.* (quoting *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998)).

No evidence was presented showing that Defendant intended to injure Plaintiff in the sense contemplated by the statute. Defendant acted with reckless disregard as to how his actions would injure Plaintiff, and as discussed in more detail below, engaged in false misrepresentations which resulted in injury to Plaintiff. However, this situation does not meet the standard for a finding of nondischargeability under section 523(a)(6). It was for these reasons that the Court granted Defendant's motion for directed verdict as to section 523(a)(6) at the conclusion of the trial. The remaining causes of action are discussed in detail below.

## II. 11 U.S.C. § 523(a)(2)(A)

Section 523(a)(2)(A) states, in relevant part:

A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt –
(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by – (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

This subsection should be construed narrowly to ensure that a debtor's fresh start is protected. *In re Rountree*, 478 F.3d 215, 219 (4th Cir. 2007) (quoting *Foley & Lardner v. Biondo (In re Biondo)*, 180 F.3d 126, 130 (4th Cir. 1999)). Section 523(a)(2)(A) excepts from discharge only those debts "in which the debtor used fraudulent means to obtain money, property, services, or credit." *Rountree*, 478 F.3d at 219.

To establish a claim under section 523(a)(2)(A), a creditor must prove the following elements:

> (1) that the debtor made a representation; (2) that at the time the representation was made, the debtor knew it was false; (3) that the debtor made the false representation with the intention of defrauding the creditor; (4) that the creditor justifiably relied upon the representation; and (5) that the creditor was damaged as the proximate result of the false representation.

*Arrow Concrete Co. v. Bleam (In re Bleam)*, 356 B.R. 642, 647 (Bankr. D.S.C. 2006) (citing *Foley & Lardner v. Biondo (In re Biondo)*, 180 F.3d 126, 134 (4th Cir. 1999); *MBNA Am. v. Simos (In re Simos)*, 209 B.R. 188, 191 (Bankr. M.D.N.C. 1997)). *See also Am. Gen. Fin. Servs., Inc. v. Rowell (In re Rowell)*, 440 B.R. 117, 119 (Bankr. D.S.C. 2010) (quoting *Thanh v. Truong (In re Thanh)*, 271 B.R. 738, 744–45 (Bankr. D. Conn. 2002)). The creditor seeking a finding of nondischargeability bears the burden of proof and must prove all the above-listed elements by a preponderance of the evidence. *MBNA Am. v. Simos (In re Simos)*, 209 B.R. 188, 191 (Bankr. M.D.N.C. 1997) (citing *Grogan v. Garner*, 498 U.S. 279 (1991); *In re Stanley*, 66 F.3d 664, 667 n.4 (4th Cir. 1995)). In the present case, Plaintiff has met her burden and established all of the elements for a finding of nondischargeability under section 523(a)(2)(A).

    1. <u>False Representations by Defendant Known by Defendant to Be False</u>

Defendant sent numerous invoices to Plaintiff representing that she owed certain amounts of money for construction costs on her home. Defendant represented to Plaintiff, prior to and throughout the construction of her home, that he would charge her only the actual costs incurred, plus 20 percent, pursuant to their "cost plus twenty" agreement. However, amounts in excess of the payments made by Defendant to subcontractors and employees were frequently added to invoices sent to Plaintiff, and no satisfactory explanation has been given for these overcharges. Defendant testified that he had documentation for these excess amounts on his laptop but that his

laptop failed and he could not get any of the information off of it. However, Defendant's testimony in this regard is simply not credible. Evidence established that Defendant's laptop failed in 2008; however, Plaintiff's counsel in the state court action first requested documents supporting the amounts charged to Plaintiff in January 2007, and Defendant failed or refused to produce such documents for an entire year, even when ordered to do so. Additionally, nearly all of the excess amounts are round numbers, such as $500 or, most commonly, $1,000. The Court finds it incredible that additional costs of exactly $1,000 would be incurred with respect to so many bills. The Court finds that Defendant made false representations to Plaintiff regarding the amount she owed him for construction of her home, and further, that when he sent Plaintiff such invoices he knew they were false or inaccurate. As a result, the first two elements of the section 523(a)(2)(A) test set forth above are met.

    2. <u>Intent to Defraud</u>

The Court finds that the representations Defendant made to Plaintiff regarding the construction costs of her home were made with the intent to defraud Plaintiff. As indicated above, many of the invoices Plaintiff received from Defendant contained additional amounts over the amount Defendant paid to employees, subcontractors, and suppliers, and in most cases these additional amounts were even sums. As the Court explained above, Defendant provided no sufficient explanation as to the additional sums; Defendant's testimony was simply not credible. Plaintiff paid almost $500,000 to Defendant which is not explained in Defendant's records relating to the home construction, and Defendant admitted he had no documentation regarding where and how the funds were spent. Further, he did not turn the records over, despite a court order to do so, at the time he claims that he had possession of the records.

Defendant also charged Plaintiff exorbitant labor costs. As explained above, Defendant added equipment overhead, labor overhead, general overhead and profit to each employee's hourly labor rate, then added an additional 20 percent fee, resulting in a markup on each employee's hourly rate of over 100 percent. Mr. Livingston and Mr. Epps, two of Plaintiff's experts, both testified that this was not reasonable and was not the standard in a cost plus contract. In fact, both experts testified that they had never seen such a significant markup. Plaintiff was also charged for large amounts of administrative labor, including 75 percent of Defendant's salary, yet some testimony suggested that Defendant did not spend a significant portion of his time on the job site. Mr. Livingston and Mr. Epps testified that charging Plaintiff for administrative labor in this manner was unreasonable and not a proper component of costs for this contract. Defendant testified that he did not charge any other client these types of field labor and administrative labor rates during 2005 and 2006. The Court finds that Defendant made representations to Plaintiff regarding the cost of her home with the intent to defraud her and that he intended to overcharge Plaintiff for his own pecuniary benefit; as a result, the third element is met.

    3. <u>Justifiable Reliance by Plaintiff</u>

The fourth element of the section 523(a)(2)(A) test requires the Court to make a two-step inquiry: "first, whether [the plaintiff] actually relied upon the misrepresentation, and second, whether the reliance was justifiable." *Lilly v. Harris*, No. Civ.A. 5:04 CV 00017, 2004 WL 1946378, at *2 (W.D. Va. Sept. 1, 2004) (citing *Field v. Mans*, 516 U.S. 59, 70 (1995)). Actual reliance is a factual finding; however, with respect to justifiability, the court must use a subjective standard and examine "'the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case . . . .'" *Id.* at *2, *3 (quoting *Field v. Mans*, 516 U.S. 59,

71 (1995)). "Justifiable reliance is a minimal standard, but one is 'required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.'" *Id.* (quoting *Field v. Mans*, 516 U.S. 59, 71 (1995)).

Ample testimony was presented regarding Plaintiff's actual reliance on Defendant. Plaintiff testified that due to the parties' personal relationship, Plaintiff trusted Defendant, had confidence in his homebuilding abilities, and never considered another builder. Plaintiff relied on Defendant to provide her with accurate invoices and to bill her only in accordance with the parties' agreement. Clearly, Plaintiff actually relied on Defendant's representations.

Plaintiff's reliance was also justifiable. Plaintiff admitted that she did not question the invoices Defendant sent her, nor did she initially ask for a detailed breakdown of the costs making up the invoices; instead, Plaintiff relied upon the bills Defendant sent her. Plaintiff also admitted that she did not keep track of how much had been spent, and even gave Defendant and his employees blank checks on several occasions. Plaintiff's actions were certainly not wise. However, Plaintiff had never been involved with a home construction before, and Defendant was aware of Plaintiff's lack of sophistication with respect to such matters. Plaintiff's lack of sophistication caused her to be unable to understand many of the invoices sent to her. Further, even if Plaintiff had examined breakdowns of the amounts being charged to her, it is likely that the unexplained amounts and egregious labor rates would not have been apparent to a party unfamiliar with home construction. Additionally, Plaintiff had recently experienced a personal loss, the death of her first husband, of which Defendant was aware, and Plaintiff testified that during the construction process she was still having a very difficult time dealing with the loss. Plaintiff was also traveling frequently during part of the construction process. Finally, Plaintiff

and her family considered Defendant a close personal friend and as a result, Plaintiff placed a great deal of trust in Defendant which she would likely not place in a builder with whom she had merely a professional relationship. For these reasons, the Court finds that Plaintiff actually relied on Defendant's representations and that her reliance was justifiable. Thus, the fourth element is met.

      4. <u>Resulting Damages</u>

As a result of Defendant's misrepresentations to Plaintiff, Plaintiff clearly suffered damages. Plaintiff spent over $2,600,000 on the home; however, the highest value at which the house was appraised was slightly over $1,600,000. Plaintiff testified that she does not use the home, that it is not what she wanted, she does not enjoy it, and that it is overwhelming to her. There are no records documenting the destination of nearly $500,000 of what Plaintiff paid to Defendant for the construction of her house. Additionally, as explained above, Plaintiff was charged exorbitant costs for field and administrative labor. Plaintiff suffered damages as a result of Defendant's false representations, and the final element of the section 523(a)(2)(A) test is met. Plaintiff's claim against Defendant is nondischargeable under section 523(a)(2)(A).

Because the Court has found that the debt is nondischargeable under section 523(a)(2)(A), the Court need not address section 523(a)(4). Regardless of the conclusion the Court might reach with respect to section 523(a)(4), the dischargeability of Plaintiff's claim against Defendant will be unaffected. Any debt arising from Defendant's overbilling or improper billing of Plaintiff under the parties' cost plus 20 percent agreement is nondischargeable under section 523(a)(2)(A).

## **CONCLUSION**

For the reasons set forth above, the Court finds that Plaintiff satisfied all the elements of section 523(a)(2)(A), and her claim against Defendant is therefore nondischargeable under 11 U.S.C. § 523(a)(2)(A). Any debt resulting from Defendant's overbilling or improper billing of Plaintiff in connection with the construction of her home is excepted from Defendant's chapter 7 discharge.

AND IT IS SO ORDERED.

**FILED BY THE COURT**
**11/09/2011**



David R. Duncan
US Bankruptcy Judge
District of South Carolina

Entered: 11/10/2011